IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| ALOTECH, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Court File No. _____ |
| | ) |
| NORTH STAR IMAGING, INC., | ) |
| | )   **JURY TRIAL DEMANDED** |
| Defendant. | ) |

## COMPLAINT

For its Complaint against Defendant North Star Imaging, Inc., Plaintiff Alotech, Ltd. states and alleges the following:

### The Parties

1. Plaintiff Alotech, Ltd. ("Alotech") is an Ohio limited liability company with its principal place of business at 8500 Clinton Road, Unit 1104A, Brooklyn, Ohio 44144. Alotech is engaged in the manufacture, research and development and prototype development of cast parts used in the military, automotive industry, aerospace industry and for other applications.

2. Defendant North Star Imaging, Inc. ("NSI") is a Minnesota corporation with its principal place of business at 19875 S. Diamond Lake Road, Rogers, Minnesota 55374. NSI can be served with process through its registered agent, CT Corporation System, Inc., 100 S. 5th Street, Suite 1075, Minneapolis, Minnesota 55402. According to its marketing materials, NSI "manufactures, sells and services state of the art x-ray imaging systems and equipment for the industrial testing market."

1

## Jurisdiction and Venue

3. Alotech is a single member limited liability company wholly owned by its sole member, John Grassi, a citizen of the State of Georgia. Therefore, for jurisdictional purposes, Alotech is a citizen of the State of Georgia.

4. NSI is a citizen of the State of Minnesota.

5. The matter in controversy in this case exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

6. By virtue of paragraphs 3 through 5 above, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).

7. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## Negotiations for the Purchase of the System

8. In the fall of 2013, Alotech and NSI entered into negotiations for Alotech's purchase of an NSI X5000 225kV Computed Tomography System (the "System"), a standard product offering of NSI. During those negotiations, Alotech informed NSI that if Yxlon components were used in the System, Alotech would not be interested in purchasing the System from NSI.

9. Because Alotech did not want to purchase any Yxlon products through NSI, during a face-to-face meeting between Alotech and NSI personnel on or about October 31, 2013 to negotiate the purchase of the System, Alotech asked NSI to specify the supplier of the x-ray tube and other components that would be used in the System. It is well known in the industry that components fail and replacement parts must be readily available and cost effective. The x-ray tube is critical to the System, and thus the quality,

availability, supply chain and other features of the x-ray tube are all very important in the selection of a tomography system. NSI specifically told Alotech that the System would utilize a proprietary x-ray tube manufactured for, and only for, NSI in Germany--*i.e.*, that the tube was an NSI x-ray tube. Because the x-ray tube is a critical item, Alotech's decision to buy the System from NSI was based heavily on the source of the x-ray tube.

10. Additionally, the System to be purchased by Alotech was subject to "qualification" by NSI in order to determine that the System purchased performed adequately. Qualification of the System creates a traceable data set linking a particular test result to the testing machine or process. This ensures that Alotech can use the machine in the testing of Alotech manufactured parts. While qualification is standard practice, in this case qualification was especially important, as Alotech has developed a process, known as "ablated castings," that produces solidified components without porosity, known in the industry as "Grade A" castings, which are nearly impossible to achieve. NSI was made aware that Alotech was to use the System for specific applications relating to porosity-free ablated castings and not to simple industry standards. Thus, having the System qualified was an absolutely critical requirement to the purchase of this tomography system. In addition, qualification of the System is standard business practice, as qualification creates a baseline result. For the layman not skilled in the art, the qualification process is akin to certifying that a specific gas pump delivers the proper amount of fuel as reflected by the pump display.

11. Without question, NSI understood that the System to be purchased by Alotech was subject to the qualification process. Indeed, during negotiations for the

purchase of the System, NSI informed Alotech that the System was already built, ready to be sold and ready to be qualified. On or about October 29, 2013, Alotech provided to NSI, and NSI accepted, several Alotech ablated product casting samples in different alloys to be imaged for purposes of qualifying the System. Alotech requested that the resulting images be provided to Alotech. Thereafter, NSI provided "qualification data" to Alotech that supposedly demonstrated the results from the System to be purchased. In good faith, Alotech accepted this qualification data purportedly proving that this particular System met Alotech's requirements. The data that NSI provided was only an image--not actual tomography images, but high-resolution picture files that could be sent by e-mail, or by a USB memory stick--because, according to NSI, the electronic files were too large to send. NSI warranted that the qualification data and the process used in creating these files, and that the files themselves, would be on the System being delivered to Alotech, in the form of settings, as a critical reference baseline for calibration.

12.   Also during negotiations for the purchase of the System, Alotech informed NSI that the System was to be physically located in Ohio at a confidential facility near Alotech, or at Alotech's facility in Brooklyn, Ohio, or at another location; and that John Grassi, President of Alotech (who is also the key metallurgical engineer), would require the ability to access the System's software remotely to control and modify and analyze images (and not merely view images) from his office in Atlanta. NSI verbally acknowledged this requirement.

13. On or about November 5, 2013, NSI prepared Quote Number WW001383 v3 (the "Quote") for Alotech regarding the System. A true and correct copy of the Quote is attached hereto as Exhibit 1 and incorporated by reference herein.

14. According to the Quote, the System is "a turnkey X-ray Inspection and Computed Tomography System designed specifically for industrial and research applications." (Ex. 1, p. 3).

15. According to the Quote, the price of the System is $498,288, with an optional third-party software package, "VGStudioMAX 64bit Cast & Mold Package (Node-Locked License)," for an additional $47,500. (Ex. 1, p. 9). This optional software is separate and distinct from the NSI operational software of the System (the "System software").

16. On November 13, 2013, Alotech requested from NSI the serial number for the particular, physical System that Alotech was purchasing. The serial number was never provided by NSI. This serial number is important, as the true tomography image used for qualification data contains this electronically stamped data and other useful information known in the art as metadata, meaning that all images are traceable to the tomography source used to take the image, including, but not limited to, settings that produce the image data. Again, Alotech was told by NSI personnel that the qualifying data and the settings that produced these images were too large to electronically send, and thus would be on the System's computer hard drive. Alotech accepted this information in good faith. In addition, Alotech specifically told NSI not to ship the System to be

purchased by Alotech unless the System qualified to Alotech's approval; otherwise, payment would not be made. NSI assured Alotech that the System would be qualified.

17.   On or about November 13, 2013, Alotech tendered Purchase Order No. 2013-419 (the "Purchase Order") to NSI to purchase the System. A true and correct copy of the Purchase Order is attached hereto as Exhibit 2 and incorporated by reference herein.

18.   The payment terms of the Quote are as follows: "40% due net 10 days upon acceptance of PO," "50% due net 10 days upon shipment or anticipated ship date if delayed by customer," and "10% due net 30 days upon successful installation and training at customer's facility not to exceed 45 days after delivery." (Ex. 1, p. 10).

19.   NSI understood that they were to qualify the System with Alotech ablated cast parts as evidenced by an e-mail from NSI to Alotech on or about December 16, 2013, in which NSI stated that they had imaged Alotech qualification parts and that the System could ship out as scheduled.

Alotech's Discovery of Nonconforming Features of the System

20.   On or about December 16, 2013, NSI shipped the System to Alotech. Alotech has paid $498,055.05, or 90% of the System purchase price, to NSI, per the payment terms set forth in the Quote. Since the time of shipment, Alotech has discovered that the System fails in several material respects to conform to the representations made by NSI during negotiations.

21.   First, after the System was installed and during an initial training session conducted by NSI at Alotech on or about January 28, 2013, Alotech discovered that the

6

System that had been delivered by NSI was being used for the first time, meaning that the qualification data provided by NSI did not originate from the System. For example, on or about January 29, 2013, NSI delivered a new "key" needed to allow the NSI qualification software to even operate. In other words, the System was never qualified; otherwise, the software would already have been working.

22. The System that is presently on-site at Alotech cannot be used by Alotech because the System has not been qualified. In addition, the machine is not in working order.

23. Second, when NSI delivered the System to Alotech, Alotech discovered that the x-ray tube utilized in the System was, in fact, manufactured by Yxlon, as indicated by the operating manuals and labeling on the x-ray tube, and not by NSI.

24. Third, the NSI System software, used to operate the System, is loaded onto the computer attached to the System. NSI did not disclose in the Quote, or in any other written or oral communication, that the use of the non-optional and "essential" System software (versus the third-party optional software) is "node locked" and thus limited by requiring a physical dongle for equipment operations. Among other things, the need for a dongle substantially limits the use of the NSI System software, and thus the remote control of the x-ray System, to one physical location at a time, rendering simultaneous utilization in Georgia and Ohio impossible, even for one user. In addition, if the node-locked dongle is lost or destroyed or fails, the machine's capacity to function is rendered useless.

25.     In contrast, NSI *did* properly make Alotech aware and specify in the Quote that other non-critical, optional software was "node locked," thereby fully making Alotech aware of a similar limitation on use for that non-essential, optional software. (*See* Ex. 1, p. 9).

26.     Fourth, NSI failed to disclose in the Quote, or in any other written or oral communication, that the System software was subject to an End User License Agreement, or "EULA," containing additional terms and conditions, and requiring Alotech's acceptance.  Instead, NSI unilaterally accepted the System software's EULA on Alotech's behalf without Alotech's knowledge or consent.  Alotech discovered the unauthorized acceptance of the EULA during an attempt to find the electronically stamped qualifying data on the System's hard drives, and only after Alotech had refused, for the above reasons, to "sign off" on the System as requested by NSI.

27.     The undisclosed restrictions, terms and conditions placed on the System software prohibit Alotech from operating the System as intended and as Alotech specifically articulated to NSI as a condition of purchase.

Rejection/Revocation of Acceptance by Alotech

28.     In light of NSI's acts and omissions above, and the non-conforming features of the System delivered to Alotech, by letter dated March 18, 2014, Alotech rejected the System that had been delivered to Alotech, and revoked any perceived or implied acceptance of that System, demanded that NSI pick the System up at Alotech's offices, and demanded a full refund of the purchase payments.  A true and correct copy of that letter is attached hereto as Exhibit 3 and incorporated by reference herein.  A second

letter, further confirming Alotech's rejection of the System that had been delivered, or revocation of the acceptance of the System, was sent on June 4, 2014.  A true and correct copy of that letter is attached hereto as Exhibit 4 and incorporated by reference herein.

29. To date, NSI has not reclaimed the System delivered to Alotech, despite the fact that the System is a standard product offering from NSI--*i.e.*, NSI indicated to Alotech that it had sold many of these same exact systems and that NSI could easily resell the machine to another customer at a higher price.  Nor has NSI refunded the purchase payments made by Alotech.  Rather than address the issues with the System that was delivered to Alotech, NSI has recently sent Alotech an invoice for the final 10% on the System.

30. The System that was delivered to Alotech has not been used by Alotech. Nor has Alotech ever accepted the System software that was loaded onto the System.

31. Alotech has spent considerable sums relating to installation of the System. These costs include, but are not limited to, shipping (which was to be paid by NSI but in fact was paid by Alotech); rigging; construction of a structure to house the System; required inspection by the State of Ohio; and other costs, for a total of more than $60,000.  In addition, Alotech lost revenue of more than $150,000 during the time that the System was being installed at Alotech.

## COUNT ONE
## FRAUD IN THE INDUCEMENT

32. For paragraph 32 of this Complaint, Alotech repeats and realleges paragraphs 1 through 31 above as though fully set forth herein.

33. During negotiations for the purchase of the System, NSI falsely represented to Alotech (1) the origins of the qualifying data provided to Alotech; and (2) that the x-ray tube that was installed in the System was manufactured for NSI and was not an Yxlon x-ray tube.

34. Additionally, at no time during negotiations for the purchase of the NSI System or in the documentation accompanying the purchase did NSI disclose to Alotech (1) that the qualifying data provided to Alotech came from a unit other than the System that NSI was shipping to Alotech; (2) that the System software that Alotech was purchasing required a node-locked dongle for the System to be accessible from Atlanta; or (3) that the NSI System software was subject to a EULA containing additional terms and conditions.

35. NSI made the above representations and omissions with knowledge of their falsity and with the intention to induce Alotech to act in reliance thereon.

36. Alotech acted in reliance on NSI's representations and omissions in entering into a contract for the purchase of the System.

37. NSI's conduct as described hereinabove constitutes fraud in the inducement.

38. As remedy for NSI's fraud in the inducement, Alotech seeks the following: a) rescission of the contract for the purchase of the System; and b) a return to Alotech of all purchase payments in the amount of $498,055.05, plus interest.

39. Additionally, Alotech seeks an award of all damages Alotech has incurred as a result of NSI's wrongful conduct, including but not limited to, cover costs incurred

in seeking a replacement for the System that was to have been delivered; costs incurred with regard to the financing of the System; the costs identified above with respect to installation of the System; the time value of labor expended by Alotech in dealing with issues related to NSI and the System; and lost business as a result of not having use of the System; and

40. Such other and further relief as this Court deems just and proper.

## COUNT TWO
## NEGLIGENT MISREPRESENTATION

41. For paragraph 41 of this Complaint, Alotech repeats and realleges paragraphs 1 through 40 above as though fully set forth herein.

42. Alternatively, the misrepresentations made by NSI to Alotech during negotiations for the purchase of the System, as described in paragraphs 33 and 34 hereinabove, were made negligently.

43. As remedy for NSI's negligent misrepresentations, Alotech seeks the following:  a) rescission of the contract for the purchase of the System; and b) a return to Alotech of all purchase payments in the amount of $498,055.05, plus interest.

44. Additionally, Alotech seeks an award of all damages Alotech has incurred as a result of NSI's wrongful conduct, including but not limited to, cover costs incurred in seeking a replacement for the System that was to have been delivered; costs incurred with regard to the financing of the System; the costs identified above with respect to installation of the System; the time value of labor expended by Alotech in dealing with

issues related to NSI and the System; and lost business as a result of not having use of the System; and

45.     Such other and further relief as this Court deems just and proper.

## COUNT THREE
## BREACH OF EXPRESS WARRANTIES
## BY AFFIRMATION, PROMISE, DESCRIPTION, SAMPLE
(Minn. Stat. § 336.2-313)

46.     For paragraph 46 of this Complaint, Alotech repeats and realleges paragraphs 1 through 45 above as though fully set forth herein.

47.     The sample data provided by NSI to Alotech were made part of the basis of the bargain and created an express warranty that the System that would be shipped to Alotech would be the System that generated the sample data.

48.     Similarly, NSI's affirmation that John Grassi would be able to access the NSI System software to control and modify and analyze images (and not merely view images) from his office in Atlanta, despite the System being physically located in Brooklyn, Ohio, became part of the basis of the bargain and created an express warranty that the System that would be shipped to Alotech would conform to that affirmation.

49.     Additionally, NSI's description of the x-ray tube as being proprietary to NSI and not an Yxlon x-ray tube was made part of the basis of the bargain and created an express warranty that the System that would be shipped to Alotech would conform to that description.

50.     NSI breached each of the express warranties described in paragraphs 47 to 49 hereinabove.

12

51. Upon discovery of the breach of express warranties described above, Alotech promptly rightfully rejected, or justifiably revoked acceptance of, the System shipped to Alotech.

52. For NSI's breach of the express warranties described above, Alotech is entitled to recovery of the purchase price paid, in the amount of $498,055.05, plus interest.

53. Additionally, Alotech seeks an award of all damages Alotech has incurred as a result of NSI's wrongful conduct, including but not limited to, cover costs incurred in seeking a replacement for the System that was to have been delivered; costs incurred with regard to the financing of the System; the costs identified above with respect to installation of the System; the time value of labor expended by Alotech in dealing with issues related to NSI and the System; and lost business as a result of not having use of the System; and

54. Such other and further relief as this Court deems just and proper.

## COUNT FOUR
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(Minn. Stat. § 336.2-314)

55. For paragraph 55 of this Complaint, Alotech repeats and realleges paragraphs 1 through 54 above as though fully set forth herein.

56. The System that was shipped to Alotech was not properly qualified. In addition, the System has been determined not to be in working condition--a condition known to NSI's technician when the System was first installed and tested at Alotech's facility.

57. Pursuant to Minn. Stat. § 336.2-314, the System is not fit for the ordinary purpose for which such goods are used.

58. Upon discovery of the breach of the implied warranty of merchantability as described above, Alotech promptly rightfully rejected, or justifiably revoked acceptance of, the System shipped to Alotech.

59. For NSI's breach of the implied warranty of merchantability as described above, Alotech is entitled to recovery of the purchase price paid, in the amount of $498,055.05, plus interest.

60. Additionally, Alotech seeks an award of all damages Alotech has incurred as a result of NSI's wrongful conduct, including but not limited to, cover costs incurred in seeking a replacement for the System that was to have been delivered; costs incurred with regard to the financing of the System; the costs identified above with respect to installation of the System; the time value of labor expended by Alotech in dealing with issues related to NSI and the System; and lost business as a result of not having use of the System; and

61. Such other and further relief as this Court deems just and proper.

COUNT FIVE
BREACH OF IMPLIED WARRANTY
OF FITNESS FOR A PARTICULAR PURPOSE
(Minn. Stat. § 336.2-315)

62. For paragraph 62 of this Complaint, Alotech repeats and realleges paragraphs 1 through 61 above as though fully set forth herein.

63. NSI knew at the time it entered into a contract with Alotech for the purchase of the System that Alotech needed a System that was qualified for Alotech's particular purpose.

64. Alotech, in good faith, relied on NSI to properly qualify the System that Alotech was purchasing.

65. The process undertaken by NSI to qualify the System prior to the System's installation at Alotech required the creation of several large electronically stamped traceable images of the samples provided by Alotech, said stamping to include the System's serial number. The images were to have been created using the very System that was to be shipped to Alotech. After Alotech could not verify that said System installed at Alotech had the qualification images or the program settings used to create the qualification images on the System's hardware, and Alotech discovered during installation that the System hardware had never been used since the software dongle was never properly activated for such tomography, Alotech requested that 1) the resulting images be provided to Alotech, and 2) the x-ray settings and programming routine used to create the qualification images be given to Alotech.

66. Despite repeated requests by Alotech, NSI has never been able to produce the original traceable and electronic stamped image files and program routines used by the x-ray system; and ultimately claimed such files had been lost, despite industry and business practice in this engineering field requiring that such files be maintained at all times as verification of the qualification process and for records associated with safety-critical components. Without such files, the System is not qualified, for NSI cannot

demonstrate that the images it claims are the qualification images came from the System that was installed at Alotech. Indeed, without said qualification files the possibility exists that NSI generated the "qualification" picture images from a much more sophisticated machine than what Alotech purchased, meaning that the "qualification data" could never be replicated using the System installed at Alotech.

67. Because the System shipped to Alotech is not qualified, pursuant to Minn. Stat. § 336.2-315, the System that was shipped to Alotech is not fit for the particular purpose for which the System was required by Alotech.

68. Upon discovery of the breach of the implied warranty of fitness for a particular purpose as described above, Alotech promptly rightfully rejected, or justifiably revoked acceptance of, the System shipped to Alotech.

69. For NSI's breach of the implied warranty of fitness for a particular purpose as described hereinabove, Alotech is entitled to recovery of the purchase price paid, in the amount of $498,055.05, plus interest.

70. Additionally, Alotech seeks an award of all damages Alotech has incurred as a result of NSI's wrongful conduct, including but not limited to, cover costs incurred in seeking a replacement for the System that was to have been delivered; costs incurred with regard to the financing of the System; the costs identified above with respect to installation of the System; the time value of labor expended by Alotech in dealing with issues related to NSI and the System; and lost business as a result of not having use of the System; and

71. Such other and further relief as this Court deems just and proper.

Dated:  September 8, 2014                    Respectfully submitted,

By:  *s/ Cynthia L. Hegarty*
Cynthia L. Hegarty (#0294627)
BEST & FLANAGAN
225 South Sixth Street
Suite 4000
Minneapolis, Minnesota 55402
(612) 339-7121
chegarty@bestlaw.com

Dana M. Richens, *pro hac vice* admission pending
SMITH, GAMBRELL & RUSSELL, LLP
Suite 3100, Promenade
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 815-3500
drichens@sgrlaw.com

ATTORNEYS FOR PLAINTIFF
ALOTECH, LTD.

013931/990605/1933426_1