## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Alotech, Ltd.,

                        Plaintiff,

                                                    Civ. No. 14-3414 (RHK/TNL)
v.                                                  **MEMORANDUM OPINION**
                                                    **AND ORDER**

North Star Imaging, Inc.,

                        Defendant.

_____

Dana M. Richens, Smith, Gambrell & Russell, Atlanta, Georgia, Amy S. Conners, Robins Kaplan LLP, Minneapolis, Minnesota, for Plaintiff.

Scott M. Rusert, Benjamin C. Johnson, Nilan Johnson Lewis PA, Minneapolis, Minnesota, for Defendant.

_____

## INTRODUCTION

Plaintiff Alotech, Ltd. ("Alotech") contracted to purchase an X-ray imaging system worth approximately $550,000 from Defendant North Star Imaging, Inc. ("NSI"). NSI manufactured, delivered, and installed the system, but Alotech was not satisfied with its performance. Alotech then filed the instant action, alleging claims for fraud in the inducement, negligent misrepresentation, and breach of express and implied warranties. NSI asserted two counterclaims for breach of contract, and cancellation and return. Presently before the Court is NSI's Motion for Summary Judgment. For the reasons that follow, the Motion will be granted.

## BACKGROUND

Viewed in the light most favorable to Alotech, the record reveals the following facts. Alotech is engaged in the manufacture, research, and development of ablated metal[1] for use in the military, automotive, and aerospace industries. (Compl. ¶ 1; M. Grassi Dep. 36.) To assess the internal microstructure of its parts, Alotech must cut the parts for examination. (M. Grassi Dep. 78.) To save time and expense, Alotech began investigating the purchase of digital X-ray computed technology ("CT") equipment. (Id.) In the fall of 2013, it was referred to Defendant NSI, a manufacturer, servicer, and seller of industrial-strength digital X-ray and 3D CT systems. (J. Dimon Dep. 14–15.) NSI also contracts with companies to scan and image items in its in-house lab. (See Taylor Dep. 9; Dimon Dep. 53–55; Meyer Dep. 63–65.)

**Initial Discussions**

Alotech's operations manager, David Ekers, engaged in initial discussions with NSI sales representative Jason Dimon. (J. Dimon Dep. 15.) Ekers informed Dimon that "timing of the quotation [was] critical" because Alotech needed to take delivery by December 31, 2013, in order to receive a substantial tax deduction. (Johnson Aff. Exs. 3, 7.) Based on Alotech's needs, Dimon recommended an NSI X5000 225kv CT System (the "System") and emailed an initial quote to Ekers on October 11, 2013. (Id. Ex. 5.) Dimon assured John Grassi, Alotech's president and owner, that delivery before year-end was possible. (Id. Ex. 6; Meyer Dep. 48.)

---

[1] Ablation is Alotech's patented process for creating metal parts. (See M. Grassi Dep. 34–36, 38–40.)

**The Visit**

On October 31, 2013, Mike Grassi, Alotech's chief engineer (and John Grassi's brother), visited NSI's facility in Rogers, Minnesota, to "see the systems being built from the beginning stages to the final product," to see demonstrations of NSI's system and software, and to "go over the data in [NSI's] CT lab." (Johnson Aff. Ex. 9.)  Grassi first attended a meeting with Dimon, Rodney Meyer, NSI's Vice President of Sales and Marketing, and Brett Muehlhauser, NSI's applications expert, for a brief discussion about Alotech's goals and needs for the System. (Meyer Dep. 11, 17–19; M. Grassi Dep. 66, 68; Dimon Dep. 8, 52.)

During the tour of the facility, Meyer, Dimon, and Grassi discussed several important components of the System, including its X-ray tube, the possibility for remote access between Brooklyn, Ohio (where Alotech is located) and Atlanta, Georgia (where John Grassi lives), and the technology's ability to meet Alotech's needs.[2]  Muehlhauser

---

[2] Alotech relies on Mike Grassi's handwritten notes, purportedly taken throughout the course of his tour at NSI, as evidence of NSI's alleged misrepresentations about these three issues.  NSI argues the notes are inadmissible hearsay. (Reply at 5.)  Alotech responds that the notes fall within the business records exception.  Yet, the record before the Court fails to establish the foundation for this exception.  See Fed. R. Evid. 803(6); compare Ecklin v. Planet Ins. Co., No. C7-90-1521, 1991 WL 1956, at *2 (Minn. Ct. App. Jan. 15, 1991) (holding cryptic and informal handwritten notes, indicating a lack of trustworthiness, were not admissible as business records) (internal quotations omitted), with Crimm v. Mo. Pac. R.R. Co., 750 F.2d 703, 709 (8th Cir. 1984) (handwritten notes admissible under Rule 803(6) when prepared pursuant to company policy under Rule 803(6)).  Furthermore, the Court is reluctant to admit the notes under any other exception because the notes are Mike Grassi's subjective interpretation of (unknown) others' statements to him throughout the day that he considered important.  See In re Acceptance Ins. Cos., Inc. Sec. Litig., 352 F. Supp. 2d 940, 951–52 (D. Neb. 2004), aff'd sub nom., In re Acceptance Inc. Cos. Sec. Litig., 423 F.3d 899 (8th Cir. 2005) (precluding admission of meeting notes under Rules 801(d)(2) and 803(5) because not accurate or verbatim transcription); Winslow v. Gen. Motors Corp., No. 2:01CV76, 2003 WL 25676481, at *3 (E.D. Ark. Mar. 20, 2003) (precluding admission of handwritten notes under Rule 802(d)(2)(D) because true source

then demonstrated a System located in its lab and showed him the capabilities of NSI's

software and the optional Volume Graphics ("VG") Studio MAX software.[3]  (Meyer

Dep. 33–34; Muehlhauser Dep. 46–47.)  According to Meyer, the software sold with the

System (efX-DR and efX-CT) is a one-seat dongle license,[4] capable of remote access

through Team Viewer.[5]  (Meyer Dep. 44–45, 56–57.)  The VGStudio MAX software was

a node-locked license, meaning it was tied to one computer and did not require a dongle.

(Id. 45–46; see Johnson Aff. Ex. 1 at 2.)

    After the tour and demonstration, Meyer again met with Grassi to go over the

quote NSI had previously emailed to Alotech.  (Meyer Dep. 18; Dimon Dep. 56.)  Meyer

testified in his deposition that they discussed "different types of X-ray tubes and different

types of detectors.  And based off [Alotech's] budget . . . they felt the 225kv Micro Focus

[tube] . . . for high resolution is what they wanted to go with, even though that was a

more expensive X-ray tube."  (Meyer Dep. 29, 30–32.)  Grassi "asked [] Meyer who

makes their X-ray tubes" (M. Grassi Dep. 106), and was told that NSI had two tube

---

of statements was unknown).  In the Court's view, the notes are inadmissible hearsay and will
not be considered.  See Fed. R. Evid. 801; Chadwell v. Koch Ref. Co., L.P., 251 F.3d 727, 731–
32 (8th Cir. 2001) (out-of-court written statements regarding out-of-court oral statements offered
to prove the truthfulness of an assertion are inadmissible hearsay); Walker v. Wayne Cty., Iowa,
850 F.2d 433, 434 (8th Cir. 1988) ("When ruling on a summary judgment motion, [the Court]
may consider only the portion of the submitted materials that is admissible or useable at trial.").

[3] The VGStudio MAX software allows for visualization and analysis of CT data.

[4] A dongle is a small device that plugs into a computer and serves as a sort of key to enable the
use of software.  The purchaser is able to load the software onto as many computers as desired
but needs the dongle to make that license valid and usable.  (Meyer Dep. 34.)

[5] Team Viewer allows the user to control the whole system from anywhere in the world, but it
does not allow for multitasking.  (Meyer Dep. 42, 44.)

suppliers, X-RAY WorX and Comet FeinFocus, and that each made its tubes in Germany (Meyer Dep. 37–38).  Grassi recalls a different answer: "[Meyer] said that that tube wasn't made by Yxlon . . . that that X-ray tube is made by NSI.  It's NSI design, it's made for NSI, it's made in Germany."  (M. Grassi Dep. 107.)  Grassi's visit at NSI concluded after this discussion.

**Sample Scans**

NSI performed three rounds of scanning for Alotech to ensure that the System would meet its needs.  The first round occurred prior to and during Grassi's visit to NSI. NSI performed these initial sample scans "to show [Alotech] the data [NSI] can produce."  (Johnson Aff. Ex. 9.)  During the visit, Dimon, Meyer, and Muehlhauser reviewed these scans with Grassi, which were taken on an X5000 System in NSI's in-house lab, similar to the System quoted for Alotech.  (Dimon Dep. 52–56; Muehlhauser Dep. 28–29.)  Muehlhauser testified that he pointed out "discontinuities" or defects in Alotech's parts to Grassi.  (Muehlhauser Dep. 34, 54, 57–59.)  Grassi denied the existence of any imperfections or porosity[6] in the parts (see Meyer Dep. 21; Muehlhauser Dep. 59, 64; see also Richens Aff. Ex. 10), and stated that the final signoff on the quality of the images and the purchase of the System had to be done by John Grassi (M. Grassi Dep. 72).

After the site visit, John Grassi sent additional parts, including parts for one of Alotech's clients, to NSI for the second round of scanning in early November.  (Johnson Aff. Exs. 17, 18.)  On November 9, John Grassi emailed Dimon saying, "The current

---

[6] Porosity is a void or hole found within a casted (or ablated) metal part.

shots you have sent appear to show porosity but none should be present . . . we will have to make a part and cut it to verify (not this one please) . . . Keep in mind I am not 'waiting' on the [purchase order] for these reasons . . . ." (Id. Ex. 18.)

A few days later, Alotech tendered a Purchase Order to NSI. (Id. Ex. 1 at 2.) On November 13, 2013, John Grassi initialed and dated the Purchase Order, the final version of the Quote, and a printed-out email exchange[7] (id. Ex. 1), and emailed these documents to Dimon (Richens Aff. Ex. 11). Alotech made its first payment of 40%, or $218,315, on November 14, 2013, as outlined in the Purchase Order and Quote. (See Johnson Aff. Exs. 1, 24.)

The third round of scanning took place a little over one month later. On December 13, 2013, Muehlhauser scanned more of Alotech's parts, sent the data and images to Alotech, and communicated with John Grassi about the System's ability to see the inside of Alotech's parts. (Muehlhauser Dep. 60–61; Johnson Aff. Ex. 34.) These images, too, showed discontinuities. (Johnson Aff. Ex. 19.) When Muehlhauser then cut open one of these parts in a spot where the images showed the discontinuity to be present (Muehlhauser Dep. 67), the part had visible holes in it (Johnson Aff. Exs. 20, 21, 33, 34).

After this presentation, on December 16, 2013, John Grassi wrote that "the main part of the concern [with the discontinuities in the parts] has been resolved. Please thank [Muehlhauser] for his work effort." (Id. Ex. 33.) John Grassi approved shipment and the

---

[7] The email exchange amended certain warranty provisions included in the Quote's terms and conditions. (See Johnson Aff. Ex. 1 at 3-5.) Paragraphs 9.2 and 9.3 contained an express warranty against defects for 12 months. (Id. at 19.) Paragraph 9.3 contained a clause regarding research that Alotech wanted removed; NSI agreed. (Id.) Alotech's attorney reviewed these revisions to the terms and conditions and stated they were acceptable. (Id. at 3.)

System shipped that same day.  (See id. Exs. 23, 33.)  The following day, John Grassi and

Muehlhauser held a conference call to review the last images.  (Richens Aff. Ex. 13.)

Grassi followed up with an email and seemed pleased with the scanned images:

> Our conference today finalized an issue (we still have [a] few more to get through)[8] regarding the inspection criteria and a few issues Alotech was concerned over prior to the order [being] placed.   Brett helped tremendously resolving the concern I had between last week and finally today.  Thus acceptance for the D2 and D3 relating only to the image and issues in finding ablated anomalies has been accepted.  For clarity this does not mean the unit is accepted in our facility but that this requirement was desired to ship the product.

(Johnson Aff. Ex. 22.)

**Installation**

The System was delivered to Alotech on December 18, 2013.  (Id.  Ex. 23.)  The

next day, NSI employee Jordan Lee went to Alotech to install the System.  (See id.

Ex. 26.)  Lee testified at his deposition that he "ran" a part on the machine—meaning he

turned the System on to its maximum power output, which caused an image to appear on

the screens, X-rays to be emitted, and the lightbulb to turn on—and ensured the System

was "operating to its full potential."  (Lee Dep. 28–29, 33–35.)  Lee testified he did not

receive any error messages and that the System was in good working order when he left.

(Id. 28, 37.)

Conversely, John Grassi testified at his deposition that Lee "encountered a

problem . . . [the System] was shutting down on him" during installation, but that Lee had

---

[8] According to NSI, and undisputed by Alotech, this comment actually reflects only one remaining issue: certain additional onsite training that John Grassi requested NSI provide for no cost.  (Def. Mem. at 10.)

contacted NSI's technical support.  (J. Grassi Dep. 52–53, 56.)  However, *Mike* Grassi

signed off on the Installation Completion Form and Lee testified that Mike Grassi

expressed no reservation about the System to him.  (Id. 39; see Johnson Aff. Ex. 26.)

Despite any alleged reservations Alotech had about the System at this point, it made a

second payment of $272,894 on December 27, 2013, then having paid a total of 90% of

the purchase price.  (Johnson Aff. Ex. 24.)

**Training**

From January 27, 2014, to February 2, 2014, NSI employee Rob Barte provided

training on the System at Alotech's facility in Ohio.  He testified in his deposition that the

System was fully functional.[9]  (Barte Dep. 17–18, 24, 41.)  He was able to power up the

X-ray tube and scan parts without incident.[10]  (Id. 22, 24.)

After the training was complete, for the sale to be final, Barte needed John Grassi

to sign off on a Final Acceptance Form.  (Id. 18.)  Grassi refused to do so because a third

---

[9] Alotech relies on a Declaration by its expert, Chris Cherry, to say that Barte did not run a scan
on the System because no data exists on the System's hard drive.  (Mem. in Opp'n at 12 (citing
Cherry Decl. ¶ 12 (Doc. No. 59)).)  The Declaration further states that Cherry attempted to use
the System on January 14, 2016; he was unable to run a 360° "indexing scan" (Cherry Decl. ¶ 6)
but was able to scan an Alotech part (id. ¶ 10).  NSI responds that the Cherry Declaration should
be stricken because it is untimely and contains expert opinions not previously disclosed.  (See
Second Am. Sched. Order (Doc. No. 42) (November 1, 2015 expert discovery deadline).)
Alotech responded at the hearing that the Declaration is factual (Mot. Hr'g Tr. at 30 (Doc. No.
66)) and not based on Cherry's opinion.  (But see Second Am. Sched. Order (November 1, 2015
fact discovery deadline).)  The Court will strike Cherry's Declaration; not only is the Declaration
untimely in all respects, Cherry performed the scans and analyzed the hard drive *one week after
NSI filed its Motion and Memorandum*.  Fed. R. Civ. P. 26(e), 37(c).

[10] The only problem Barte encountered was a blown lightbulb, which he quickly resolved.
(Barte Dep. 17.)  The blown lightbulb temporarily prevented him from being able to engage the
X-ray tube and turn it on.  (Id. 22–23.)  However, after switching out the lightbulb, the System
was once again fully functional.  (Id. 23.)

monitor had been delivered that Alotech had not ordered and its return had yet to be resolved with NSI's sales department.  (Id. 19, 36, 41; see also J. Grassi Dep. 65.) Contrary to Barte's testimony, Grassi testified in his deposition that the machine was not working when Barte left.  (J. Grassi Dep. 64.)  Relying on these issues and others, Alotech did not pay, and still has not paid, the remaining balance of $54,578.80, which was due "upon successful installation and training at [Alotech's] facility." (See Johnson Aff. Ex. 1 at 2.)

**Attempted Termination of the Agreement**

On March 18, 2014, Alotech notified NSI that it was rejecting the System, revoking any acceptance, and terminating the Purchase Contract.  (Richens Aff. Ex. 17.) It gave three reasons: (1) the System contained a Yxlon brand X-ray tube; (2) the System's software required a dongle to operate and Alotech did not agree to accept the risk of the dongle being easily lost or stolen in transport between Brooklyn and Atlanta; and (3) NSI accepted the System's End User License Agreement ("EULA")[11] without Alotech's authorization.  (Id.)  Alotech asked for a full refund and that the System be returned based on these complaints.  (Id.)  Attempts to resolve these issues were made by the parties but by April there had been no resolution.[12]  (Johnson Aff.  Ex. 31; Def. Mem. at 13; see Richens Aff.  Ex. 18.)

---

[11] An EULA is the contract between the licensor and purchaser, establishing the purchaser's right to use the proprietary software.

[12] Regarding the System's software, NSI offered to provide a second software license for John Grassi's home office in Atlanta and to accept a return of the VGStudio MAX software, even

Alotech sent another letter to NSI on June 4, 2014, stating that since its last letter it believed the scanned images provided to it had not been taken on the System it received. (Richens Aff. Ex. 18.)  Alotech indicated that because of its "many major concerns about the NSI System and how the companies would be able to work together in the future," it was again demanding a full refund and a return of the "unused NSI System."  (Id.)

Alotech commenced this action in September 2014, alleging fraud in the inducement, negligent misrepresentation, breach of express warranty, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.  NSI asserted a breach-of-contract counterclaim based on Alotech's outstanding 10% balance on the Purchase Order.  NSI also asserted an alternative counterclaim for cancellation and return based on the restocking fee it would charge if the System were returned.  With discovery complete, NSI moves for summary judgment on all of Alotech's claims, as well as on its counterclaims.  The Motion has been fully briefed, the Court heard oral argument on February 18, 2016, and the Motion is ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042

---

though this software might have solved the remote-access issue.  (Johnson Aff. Exs. 30, 31; see Taylor Decl. ¶¶ 10, 11.)  Alotech did not accept this offer.

(8th Cir. 2011) (*en banc*); <u>Whisenhunt v. Sw. Bell Tel.</u>, 573 F.3d 565, 568 (8th Cir. 2009).  But, the nonmoving party must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c)(1)(A); <u>Wood v. SatCom Mktg., LLC</u>, 705 F.3d 823, 828 (8th Cir. 2013). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  <u>Beard v. Banks</u>, 548 U.S. 521, 529–30 (2006); <u>Weitz Co., LLC v. Lloyd's of London</u>, 574 F.3d 885, 892 (8th Cir. 2009).

On a motion for summary judgment, the court does not weigh facts or evaluate the credibility of affidavits and other evidence.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).  Moreover, the nonmovant cannot avoid summary judgment in favor of the movant merely by pointing to some alleged factual dispute between the parties.  <u>Get Away Club, Inc. v. Coleman</u>, 969 F.2d 664, 666 (8th Cir. 1992).  Instead, any fact alleged to be in dispute must be "outcome determinative under prevailing law"; that is, it must be material to an essential element of the specific theory of recovery at issue.  <u>Id.</u> Essentially, the court performs the threshold inquiry of determining whether there is a need for a trial.  <u>See</u> <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250.

## ANALYSIS

### I.      Fraud in the Inducement

The parties entered into an agreement in November for the purchase of an NSI System.  (Johnson Aff. Ex. 1.)  Alotech argues, however, that it did not receive the machine NSI led it to believe it would be receiving, and hence it asserts a claim for fraud in the inducement of the agreement.  If this claim is successful, it would invalidate the

entire agreement.  E.g., Kirby v. Dean, 199 N.W. 174, 175 (Minn. 1924); Mlnazek v.

Libera, 86 N.W. 100, 101 (Minn. 1901).[13]

Alotech alleges it was fraudulently induced by several false statements and

intentional omissions made by NSI.  Specifically, it argues NSI knowingly made false

representations that (1) the qualifying data—the results of the scans—came from the

System that would be shipped to Alotech and (2) the X-ray tube in the System would be

manufactured by NSI and not by Yxlon.  (Compl. ¶¶ 33, 35.)  It further argues that NSI

intentionally failed to disclose that the System's software required a "node-locked

dongle" for remote access and was subject to an EULA.  (Id. ¶¶ 34, 35.)

To state a claim for fraud in the inducement, a plaintiff must show that "(1) there

was a false representation by a party of a past or existing material fact susceptible of

knowledge; (2) made with knowledge of the falsity of the representation or made as of

the party's own knowledge without knowing whether it was true or false; (3) with the

intention to induce another to act in reliance thereon; (4) that the representation caused

the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage

as a result of the reliance."  OrthoAccel Techs., Inc. v. Devicix, LLC, Civ. No. 15-1503,

2015 WL 4563134, at *3 n.1 (D. Minn. July 29, 2015) (Frank, J.); accord, e.g., Hoyt

Props., Inc. v. Prod. Res. Grp., LLC, 736 N.W.2d 313, 318 (Minn. 2007); Target Corp. v.

LCH Pavement Consultants, LLC, 960 F. Supp. 2d 999, 1008 (D. Minn. 2013) (Keyes,

M.J.) ("A claim for fraud in the inducement is only different from a common-law fraud

---

[13] The parties agree Minnesota law applies here.  (See Mot. Hr'g Tr. at 36; Johnson Aff. Ex. 1
at 20 ¶ 17.)

claim in that it requires a claim that the fraud contributed to the formation of a contract.")

(citing Welch v. Buller, 481 N.W.2d 856, 859 (Minn. Ct. App. 1992)) (internal

quotations omitted).  NSI argues that Alotech has not shown that misrepresentations of

material facts were made, that Alotech reasonably relied on these statements, or that

Alotech has suffered any damage.[14]  Bolander v. Bolander, 702 N.W.2d 529, 541 (Minn.

Ct. App. 2005); Helmers v. Bernstein, No. C4-88-2318, 1989 WL 84167, at *2 (Minn.

Ct. App. Aug. 1, 1989) (summary judgment is appropriate when not all elements are

present).

### Misrepresentation #1: Qualification Testing

Alotech's argument on this issue is difficult to ascertain.  It seems to argue NSI

made two misrepresentations on this topic: first, that NSI represented the scanned images

were coming from its System (meaning the System that was delivered to it in December)

as part of the "qualification process"[15] and not from a different X5000 system in NSI's

lab; and second, that NSI represented its System would undergo "qualification testing."

(See Compl. ¶¶ 33–34; Mem. in Opp'n at 14–22.)  NSI admits that the System Alotech

received was not subject to qualification testing and responds that it made no

representations that such testing would be performed or that the scans came from

---

[14] NSI also argued that because it has performed its obligations under the parties' written agreement—evidenced by the fact that Alotech did not bring a breach-of-contract claim—Alotech's fraudulent-inducement claim fails.  (Def. Mem. at 16 (citing Wixon Jewelers, Inc. v. Di-Star, Ltd., 218 F.3d 913, 914 (8th Cir. 2000) ("For a fraud in the inducement claim to succeed, the defendant must not have met the obligations of the contract.")).)  However, the Court need not address this issue because it finds no fraud.

[15] "For the layman not skilled in the art, the qualification process is akin to certifying that a specific gas pump delivers the proper amount of fuel as reflected by the pump display." (J. Grassi Decl. ¶ 4 (Doc. No. 23).)

Alotech's System.  (Def. Mem. at 18; <u>see</u> Meyer Dep. 40–41, 59; Muehlhauser Dep. 101–02; Dimon Dep. 61–63, 119.)

Finding no evidence of a representation to support either argument, Alotech has, at best, shown that qualification testing is an industry-wide practice—a practice that requires a written scope of work attached to the purchase order containing the customer's specifications.  (J. Grassi Decl. ¶ 4; M. Grassi Dep. 83, 89 ("it is understood that a machine needs to be run off and qualified" meaning to "prove it works . . . *by* [*the*] *specifications*") (emphasis added); <u>see also</u> Muehlhauser Dep. 90–92; Meyer Dep. 40, 58–59; Dimon Dep. 62, 116–17.)  Yet, the record plainly reveals that Alotech did *not* give NSI any written specifications or a scope of work for such testing to occur.  (M. Grassi Dep. 75, 87–89; Dimon Dep. 119.)  While Alotech "expected qualification testing" (Mem. in Opp'n at 19; <u>see also</u> M. Grassi Dep. 89), the record fails to show that Alotech bargained for such testing or that NSI promised to perform it (<u>see</u> M. Grassi Dep. 87–88).  There being no evidence of a misrepresentation, summary judgment will be granted on this issue.

**Misrepresentation #2: The X-ray Tube**

Next, Alotech argues that, because the X-ray tube is a critical component of the System, the quality—and thus the manufacturer—of the tube was an important factor in deciding from whom to buy an X-ray machine.  (Mem. in Opp'n at 23.)  Unlike the previous issue, Alotech has presented evidence to create a fact issue as to whether a misrepresentation was made by NSI assuring Alotech it would not get what it did not want—a tube manufactured by Yxlon.  (<u>See</u> M. Grassi Dep. 107.)

14

But, while Alotech has established a fact issue exists, it fails to explain why it is a *material* fact.  Alotech concludes "this is a material issue—material enough for Mike Grassi to have had an extended conversation with NSI . . . during his visit" (Mem. in Opp'n at 23); this is insufficient to show materiality.  First, even if the length of a discussion determined materiality, there is no evidence in the record to support such an argument.  Second, it is undisputed that the X-ray tubes are easily interchangeable and that the Yxlon tube in Alotech's System can be exchanged for whatever brand it chooses. (Def. Mem. at 27.)  Third, NSI presented undisputed evidence both to this Court and to Alotech which showed the Yxlon tube is arguably the better tube.  (See Johnson Aff. Ex. 31; Taylor Decl. ¶ 8 (Doc. No. 27).)  In fact, NSI believed the X-ray tube was no longer a problem after NSI provided this information because Alotech stopped discussing it.  (See Taylor Decl. ¶ 8.)

Further, Alotech's contradictory reasoning for why it did not want a Yxlon tube shows that any reliance it had on this "misrepresentation" was unreasonable.  See Hoyt Props, 736 N.W.2d at 320–21 (party must proffer evidence demonstrating both actual and reasonable reliance to prevail on a fraud claim).  Alotech argues it would not have bought NSI's System if it contained a tube manufactured by the European brand Yxlon because it was concerned about the "availability of parts and service" for a tube made in Europe. (Mem. in Opp'n at 6, 22; see M. Grassi Dep. 106–07.)  But, the tube Alotech thought it was getting—whether the NSI designed tube made for NSI *in Germany*, or the tubes manufactured *in Germany* by Comet FeinFocus or X-RAY WorX—would also be subject to the same speculative international limitations.  It was unreasonable for Alotech to have

acted in reliance on this "misrepresentation" when it disapproved of the Yxlon tube *solely*

on the basis that it was made in Europe, but then purchased a tube it knew was made in

Europe.  This logic defies common sense and defeats a finding of reasonable reliance.

Finally, Alotech has not presented evidence showing it has suffered pecuniary

damage as a result of this alleged misrepresentation.  See Bishop v. Fillenworth, 18

N.W.2d 775, 776 (Minn. 1945) ("[F]raud without damage . . . will not sustain [a fraud]

action.").  There has been no assertion that the X-ray tube that was installed in Alotech's

System was itself broken or incapable of working.  And, again, there is no evidence to

dispute that the Yxlon tube can be easily exchanged.  Failing to present evidence on three

necessary elements, summary judgment will be granted on this issue.

**Misrepresentation #3: Remote Accessibility**

The exact contours of Alotech's argument on this issue are unclear to the Court.

In the Court's view, Alotech argues that what it wanted was simultaneous utilization and

manipulation of the System in Atlanta and in Brooklyn, which would require purchasing

a separate dongle license for $86,000.[16]  (Mem. in Opp'n at 24; see also Meyer Dep. 42,

44–45.)  It is undisputed that during Mike Grassi's visit, the parties discussed John

Grassi's ability to remotely access the software.  (Dimon Dep. 59–60.)  However, the

---

[16] The Complaint puts forth a slightly different argument which seems to have been altered throughout the course of this litigation; it asserts that NSI failed to disclose that the System's software required a dongle to operate remotely.  (Compl. ¶ 34.)  However, NSI has presented undisputed evidence that Alotech *is* able to remotely access the System—without a dongle—via the Team Viewer program, which allows for "control of the whole X-ray System."  (Def. Mem. at 28; see also Meyer Dep. 41–45; Muehlhauser Dep. 100–01.)  Moreover, as NSI argues, a fraud by omission allegation cannot support a fraudulent inducement claim where NSI had no duty to disclose this information.  See, e.g., Driscoll v. Standard Hardware, Inc., 785 N.W.2d 805, 812 (Minn. Ct. App. 2010).

record bears no clarity on what remote access capabilities Mike Grassi said his brother wanted at the time the agreement was being negotiated—the time period relevant for this claim.[17]   (See Meyer Dep. 42–43.)   The only evidence before the Court is Meyer's deposition testimony that he told Mike Grassi that John Grassi would be able to remotely access the System from Atlanta via the program Team Viewer.   (Id. 41–42.)   There being no evidence of a misrepresentation at the time the agreement was entered into, summary judgment will be granted on this issue.

### Misrepresentation #4: The Unauthorized Acceptance of the EULA

Finally, Alotech argues that NSI failed to disclose that the System's software was subject to an EULA.   (Compl. ¶¶ 26, 34.)   It seems NSI accepted a EULA on behalf of Alotech while it was manufacturing and installing the System; Alotech argues this acceptance was unauthorized.   But, even if NSI did have a duty to disclose this information to Alotech, proof of damage is an essential element of a fraud in the inducement claim.   See Hoyt Props., 736 N.W.2d at 318; Bishop, 18 N.W.2d at 776. Alotech has failed to explain how the "unauthorized" acceptance of this commonplace agreement has caused it any damage, and therefore, summary judgment will be granted on this issue.

In sum, it seems Alotech failed, in several respects, to specify and clarify what it wanted while it was negotiating the agreement and now tries to find a remedy at law. But, it has not submitted sufficient evidence to support all elements of its fraud *in the*

---

[17] The fact that Alotech changed its mind *after* the agreement was performed or *later* realized it misunderstood the capabilities of the access does not support a *fraud-in-the-inducement* claim. See Target Corp., 960 F. Supp. 2d at 1008.

*inducement* claim as to the issues it raises.  See Helmers, 1989 WL 84167, at *2.

Accordingly, the Court will grant summary judgment on Count I.

## II.    The Written Agreement

Because the Court will dismiss the fraud-in-the-inducement claim, it becomes

necessary to discuss what constitutes the parties' written agreement in order to proceed.

NSI argues the agreement includes the Purchase Order, the 12-page Quote, the terms and

conditions, and the email exchange.  (Reply at 8–9.)  Alotech contends the Purchase

Order and the 12-page Quote alone constitute the agreement (Mem. in Opp'n at 28), and

that the terms and conditions and the email exchange (see Johnson Aff. Ex. 1 at 3–5, 18–

20) are not part of the written agreement because John Grassi "mistakenly" signed them

(Mem. in Opp'n at 10, 29 & n. 6).  John Grassi testified at his deposition that he thought

he was signing documents that pertained to the scanning of Alotech's parts and alludes to

his failure to read the entire document because he was under a time crunch to get the deal

done.  (J. Grassi Dep. 32–33.)

In the Court's view, Alotech's argument is without merit, given that a party's

outward, objective manifestations of assent are determinative, not a party's subjective

intent.  Speckel v. Perkins, 364 N.W.2d 890, 893 (Minn. Ct. App. 1985).  Hence, it does

not matter what Grassi thought when he signed the documents, including the terms and

conditions and the email exchange.  See, e.g., Gartner v. Eikill, 319 N.W.2d 397, 398

(Minn. 1982) ("In the absence of fraud or misrepresentation, a person who signs

a contract may not avoid it on the ground that he did not read it."); Dunlap v. Warmack-

Fitts Steel Co., 370 F.2d 876, 884 (8th Cir. 1967).  There being no issue of fact for the

jury's determination on this issue, the Court finds that the terms and conditions are part of the parties' written agreement.

Pertinent to Alotech's last three claims, the terms and conditions contain a warranty disclaimer, which provides:

> THE WARRANTIES OF THE COMPANY IN SECTION 9 ARE EXPRESSLY IN LIEU OF ANY OTHER WARRANTIES, GUARANTEES, CONDITIONS, OBLIGATIONS OR LIABILITIES WHICH MAY BE EXPRESSED OR IMPLIED BY THE COMPANY OR ITS REPRESENTATIVES, ALL STATUTORY AND IMPLIED WARRANTIES OR CONDITIONS, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, AND OTHER THAN TITLE, ARE HEREBY EXPRESSLY NEGATED AND EXCLUDED.

(Johnson Aff. Ex. 1 at 19 ¶ 10.1.)  The remaining claims turn on the disclaimer's validity.

## III.    Breach of Warranties

Alotech asserts three claims against NSI for its alleged breach of various implied and express oral warranties.  First, it asserts NSI breached the implied warranty of merchantability (Count IV) because the System was not qualified, not in good working condition, and not fit for its ordinary purpose.  (Compl. ¶¶ 56–57.)  Second, Alotech asserts NSI breached the implied warranty of fitness for a particular purpose (Count V) because the System was never qualified and was thus not fit for the particular purpose that Alotech required.  (Id. ¶¶ 63–67.)  NSI responds that these two claims should be dismissed because the agreement's terms and conditions effectively disclaimed all implied warranties.

Under Minnesota law, a seller can disclaim all express and implied warranties, including the warranties of fitness for a particular purpose and merchantability, if the

disclaimer meets certain requirements.  Minnesota Statutes § 336.2-316 provides, in

relevant part, that "to exclude . . . the implied warranty of merchantability . . . the

language must mention merchantability and in case of a writing must be conspicuous, and

to exclude . . . any implied warranty of fitness the exclusion must be by a writing and

conspicuous."  Minn. Stat. § 336.2-316(2).  Here, the disclaimer was in writing, it

mentioned merchantability, and it was conspicuous.  Am. Computer Trust Leasing v.

Jack Farrell Implement Co., 763 F. Supp. 1473, 1488 (D. Minn. 1991) (Doty, J.) (finding

disclaimer conspicuous as a matter of law where it "is printed in all capital letters while

the surrounding terms are almost entirely in regular type").  The disclaimer validly

excluded implied warranties and NSI's Motion will be granted as to Counts IV and V.

Finally, Alotech alleges NSI made and breached three express warranties

(Count III).  It re-alleges three of NSI's alleged misrepresentations as express warranties.

(Compl. ¶¶ 47–49.)  NSI argues inter alia that Alotech is unable to make out the essential

elements of a breach-of-warranty claim.  To establish such a claim, Alotech must show

the existence of a warranty, a breach thereof, and evidence of a causal connection

between the breach and the damages suffered.  E.g., Peterson v. Bendix Home Sys., Inc.,

318 N.W.2d 50, 52–53 (Minn. 1982).

Because the Court has already determined Alotech did not submit evidence to

create a genuine and material fact dispute as to the existence of two of these statements

(Compl. ¶¶ 47, 48), the Court need only address the third alleged express warranty—"the

X-ray tube [was] proprietary to NSI and not a Yxlon X-ray tube" (id. ¶ 49).  However, as

discussed above, Alotech has not established a genuine issue of material fact as to

20

whether NSI's alleged breach by installing a Yxlon tube caused Alotech any harm.  Even

if a warranty was created, this failure to prove damage is fatal.  <u>See, e.g.</u>, <u>Sipe v.</u>

<u>Workhorse Custom Chassis, LLC</u>, 572 F.3d 525, 531 (8th Cir. 2009) (failure to prove

damage warrants grant of summary judgment); <u>Briehl v. Gen. Motors Corp.</u>, 172 F.3d

623, 628 (8th Cir. 1999).  As such, the Court will grant NSI's Motion on Alotech's

breach-of-express-warranty claim (Count III).

## IV.   Negligent Misrepresentation

Alotech asserts a negligent-misrepresentation claim (Count II) based on the same

four issues addressed above in section I.  (Compl. ¶¶ 33, 34, 42.)  But, in Minnesota, the

economic-loss doctrine limits common-law misrepresentation claims; it provides in

relevant part: "A buyer may not bring a common law misrepresentation claim against a

seller relating to . . . goods sold . . . unless the misrepresentation was made *intentionally*

or *recklessly*."[18]  Minn. Stat. § 604.101, subd. 4 (2014) (emphases added).  To be clear,

*negligent* misrepresentation is not a valid claim in Minnesota where it relates to a sale of

goods.  <u>Minn. Pipe & Equip. Co. v. Ameron Int'l Corp.</u>, 938 F. Supp. 2d 862, 874

(D. Minn. 2013) (Tunheim, J.); <u>Valspar Refinish, Inc. v. Gaylord's, Inc.</u>, 764 N.W.2d

359, 370 (Minn. 2009).  Instead, Alotech changes its theory in response to NSI's Motion

and now argues that NSI made *reckless* misrepresentations.  (Mot. Hr'g Tr. at 33 (Doc.

No. 66).)  However, it did not allege this in its Complaint and it cannot assert a new claim

or theory at this juncture.  <u>See</u> <u>In re St. Jude Med., Inc., Sec. Litig.</u>, 629 F. Supp. 2d 915,

---

[18] Alotech alleges the misrepresentations were made intentionally in its fraud-in-the-inducement claim.  (<u>See</u> Compl. ¶ 35.)

920–21 (D. Minn. 2009) (Rosenbaum, J.); Kinkead v. Sw. Bell Tel. Co., 49 F.3d 454, 457

(8th Cir. 1995).  This was a deal brokered at arm's length by two sophisticated businesses

and Alotech's remedy lies in a breach-of-contract claim—which it did not bring—or an

*intentional* misrepresentation claim—which it did assert.  See Stephenson v. Deutsche

Bank AG, 282 F. Supp. 2d 1032, 1061 (D. Minn. 2003) (Kyle, J.).  Accordingly,

summary judgment will be granted as to Count II.

## V.     NSI's Counterclaim

NSI asserted a breach-of-contract counterclaim against Alotech based on its failure

to pay the outstanding balance on the agreement.[19]  Alotech's sole defense is that, if its

claims are successful, the contract would be rescinded and there would be no contract to

have breached.  However, the Court has granted summary judgment on all of Alotech's

claims.  NSI has met its burden to show there are no genuine issues of material fact as to

its counterclaim; it presented evidence of a valid contract between the parties (Johnson

Aff. Ex. 1), that it performed its obligations pursuant to the contract, and that Alotech

owes $54,578.80 (id. Ex. 24).  Alotech does not dispute this is the amount it owes.  In

fact, it tacitly admits it has not paid the full purchase price by asking for an "offset" in the

amount of $47,500—the purchase price of the VGStudio MAX software which Alotech

decided it did not need and wanted to return.  (Mem. in Opp'n at 30.)  NSI replies that

Alotech rejected NSI's offer to accept the return of this software when Alotech chose to

---

[19] To prevail on a breach-of-contract claim, NSI must show (1) the formation of a contract;
(2) NSI's performance of any conditions precedent to its right to demand performance from
Alotech; and (3) Alotech's breach of the contract.  E.g., Indus. Rubber Applicators, Inc. v. Eaton
Metal Prods. Co., 171 N.W.2d 728, 731 (Minn. 1969).

file this lawsuit. (Reply at 9.) Regardless of this dispute, there are no genuine issues of material fact here and NSI is entitled to judgment as a matter of law for Alotech's breach of the contract.[20]

### CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that NSI's Motion for Summary Judgment (Doc. No. 51) is **GRANTED**, and Alotech's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**. NSI's Motion is also **GRANTED** as to its breach-of-contract counterclaim (Doc. No. 11). NSI's counterclaim for cancellation and return (Doc. No. 11) is **MOOT** and is **DISMISSED WITHOUT PREJUDICE**. Defendant NSI shall recover of Plaintiff Alotech the sum of $54,578.80.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: March 22, 2016                    s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge

---

[20] As such, NSI's alternative counterclaim is moot.